90 P.3d 1053 (2004)
151 Wash.2d 645
WESTERN FARM SERVICE, INC., a Delaware corporation, Respondent,
v.
Lynn J. OLSEN, II, and Julie Olsen, husband and wife, Defendants, Key Bank of Washington, A National Banking Association, Petitioner.
J.R. Simplot Company, a foreign Corporation, Respondent,
v.
Key Bank National Association, a national banking association, Petitioner,
Lynn J. Olsen, II, and Julie Olsen, husband and wife, Defendants.
Tri-River Chemical Company, Plaintiff,
v.
Key Bank National Association, a national banking association, Petitioner.
No. 73666-9.
Supreme Court of Washington, En Banc.
Argued January 15, 2004.
Decided May 27, 2004.
Jerry N. Stehlik, Seattle, for Other Party (Ford Elsaesser).
Donald Louis Anderson, Clemencia Castro-Woolery, Tacoma, for Petitioners Key Bank of Washington and Keybank National Association.
Christopher Mark Alston, Seattle, for Plaintiff (Tri-River Chemical Co.)
Robert C. Tenney, Jerome R. Aiken, Yakima, for Rspondent J.R. Simplot Co.
Larry Washburn Larson, Randy J. Fair, Moses Lake, for Respondent Western Farm Service Inc.
MADSEN, J.
Key Bank National Association (Key Bank) challenges a Court of Appeals decision reversing the trial court's grant of summary judgment in its claim for conversion against J.R. Simplot Co. (Simplot). Key Bank, which held a security interest in potato crops purchased by Simplot, claims that Simplot converted proceeds when it failed to designate Key Bank as a copayee on a check issued to the seller as a hauling allowance. We hold that the hauling allowance constitutes proceeds and reinstate the judgment of the trial court.

*1054 FACTS
Lynn Olsen is a potato and onion farmer, farming approximately 4,000 acres of land. Key Bank financed Olsen's farming operation between 1996 and 1998 and had a perfected security interest in Olsen's assets, including all general crops and proceeds thereof as well as instruments arising out of sales or other disposition of crops. Key Bank's security interest in crops and the proceeds was perfected by filing a financial statement on April 1, 1996. There were no prior filings. Pursuant to the Food Security Act of 1985, 7 U.S.C. § 1631(e), Key Bank sent a notice to buyer alerting Simplot, with which Olsen contracted for as many potatoes as he had grown, of its security interest in Olsen's crops in 1996 and 1997. The notice to buyer stated that all proceeds shall be paid jointly to Olsen and Key Bank.
In one of the contracts between Olsen and Simplot, Olsen was to deliver his potatoes to a place designated by Simplot at Olsen's own expense. However, the contract also provided that Simplot was to give Olsen a hauling allowance, along with payment for the sale of the potatoes, once Olsen completed delivery. After the delivery, Simplot issued a check to Olsen for $160,607.44 representing a hauling allowance, made payable only to Olsen, not to Key Bank.
For reasons unrelated to the issue under consideration here, Simplot sued Key Bank for breach of contract. Key Bank then filed a counterclaim against Simplot for conversion, alleging that Simplot converted money by issuing a check payable only to Olsen. Both Key Bank and Simplot filed motions for summary judgment. Key Bank asserted that Simplot should have designated Key Bank as a copayee of the check because Key Bank's security interest covered the hauling allowance as proceeds of the potato crop. The trial court granted summary judgment in favor of Key Bank.
Simplot appealed and the Court of Appeals reversed, concluding that there was no conversion because the hauling allowance was not proceeds of the potato crops. W. Farm Serv., Inc. v. Olsen, 114 Wash.App. 508, 522, 59 P.3d 93 (2002), review granted, 150 Wash.2d 1008, 77 P.3d 652 (2003).

ANALYSIS
The issue presented here is whether a payment for hauling potatoes, made pursuant to a contract for the sale of potatoes, constitutes crop proceeds that are subject to a security interest in the potato crops. Key Bank claims that Simplot converted proceeds when it failed to name Key Bank as a joint payee on the check it paid Olsen for hauling potatoes.[1]
The legislature has defined the term "proceeds" broadly. Former RCW 62A.9-306(1) (1995) provided that proceeds include "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." Key Bank argues that the trial court correctly applied the statute and relevant case law when it held that the hauling allowance paid to Olsen constituted proceeds. We agree.
As this court has noted, the broad statutory definition of proceeds is intended to ensure that the term will be all-encompassing and will be given "`a flexible and broad content.'" Rainier Nat'l Bank v. Bachmann 111 Wash.2d 298, 302, 757 P.2d 979 (1988) (quoting In re Munger, 495 F.2d 511, 513 (9th Cir.1974)). In Rainier National Bank, the bank held a security interest in the debtors' collateral, including their dairy cattle and the proceeds. Id. at 299-300, 757 P.2d 979. Under the Food Security Act of 1985, the debtors received payments from the federal government in exchange for selling all of their cattle for slaughter or for export and an agreement not to acquire any interest in dairy cattle or in the production of *1055 milk. Id. at 300, 757 P.2d 979. The debtors refused to assign the payments from the government to the bank, claiming that the bank's security interest did not cover the government payments, although it covered the cash gained through the sale of their cattle. Id. at 301, 757 P.2d 979. In concluding that the payments were included in proceeds, the court noted that, by including the words "whatever is received" in the statutory definition of proceeds, the legislature clearly intended to include more than the usual cash proceeds received in a normal sale of collateral. Id. at 303, 757 P.2d 979.
We employed an expansive reading of proceeds again in Central Washington Bank v. Mendelson-Zeller, Inc., 113 Wash.2d 346, 779 P.2d 697 (1989). In that case, the bank financed the debtor's expenses for their crops. 113 Wash.2d at 349, 779 P.2d 697. As collateral, the bank retained a perfected security interest in the apple crops and the proceeds. Id. Pursuant to the bank's requirements, the debtors contracted with Premium Packing and Storage, Inc. (Premium) to operate as a commission merchant. Id. at 349-50, 779 P.2d 697. In turn, Premium had a sales agent agreement with Mendelson-Zeller to perform marketing functions for a commission. Id. at 350, 779 P.2d 697. Mendelson-Zeller sold the apples and advanced funds to Premium for picking, hauling, and packing expenses. Id. Premium retained the packing advances and distributed the picking and hauling expenses to the debtors and other growers. Id. When Mendelson-Zeller sold the debtors' crops, it retained a part of the gross proceeds as sales commission and brokerage fees and repayment of advances made to Premium, remitting the remaining proceeds to Premium. Id. In turn, Premium deducted its commission and forwarded the remaining amount to the bank. Id. The bank brought a conversion action against Premium and Mendelson-Zeller, claiming a right to all proceeds.[2]Id. In its defense, Mendelson-Zeller argued that the bank's proceeds included only payments received by the debtors after payment of the costs of handling and marketing. Id. at 359, 779 P.2d 697. The court rejected this claim, finding that the term "proceeds" includes "whatever is received," including proceeds that were not actually received by the debtor. Id. at 360, 779 P.2d 697. In reaching this conclusion, the court quoted language from Johanson Transportation Service v. Rich Pik'd Rite, Inc., where the court held that "[p]roceeds `includes all economic components that go into the total amount received for the product.'" 164 Cal.App.3d 583, 592, 210 Cal. Rptr. 433 (1985); Cent. Wash. Bank, 113 Wash.2d at 361, 779 P.2d 697. The court also relied on a pre-U.C.C. case, Cashmere Valley Bank v. Pacific Fruit & Produce Co., 198 Wash. 363, 88 P.2d 579 (1939), where the factual situation was virtually identical to that of Central Washington Bank. In Cashmere Valley Bank, this court held that a merchant of fruits covered by the security interest could not deduct handling expenses because a creditor, whose rights were subordinate to those of a secured party, would otherwise be able to defeat the secured interest in collateral. Cashmere Valley Bank, 198 Wash. at 369-70, 88 P.2d 579.
The Johanson case, quoted in Central Washington Bank, is particularly germane. There, Wells Fargo and Rich Pik'd Rite had a security interest in strawberries and proceeds grown by a farmer. 164 Cal.App.3d at 586, 210 Cal.Rptr. 433. Johanson Transportation Service (Johanson) advanced freight charges to the farmer, who failed to repay. Id. at 587-88, 210 Cal.Rptr. 433. The freight charges were included in the sale price to the fruit buyer. Id. at 587, 210 Cal.Rptr. 433. The farmer deposited all the checks he received for the sale of the strawberries in the deposit account at Wells Fargo. Id. Johanson sued Wells Fargo and Rich Pik'd Rite for conversion and unjust enrichment. Id. at 588, 210 Cal.Rptr. 433. Johanson claimed that the freight charges were not included in proceeds. Id. at 591, 210 Cal.Rptr. 433. The court rejected Johanson's claim, stating that the term "proceeds" is to be construed broadly. Id.
Simplot, however, urges that Johanson is distinguishable and that the court should instead *1056 follow Thompson v. Danner, 507 N.W.2d 550 (N.D.1993). In Thompson, a bank had a security interest in potato crops grown by growers Thompson and Danner. 507 N.W.2d at 553. The growers sold their potato crops to Simplot. Id. The potatoes-sales contracts between Simplot and Danner contained a section for storage payments to Danner because those contracts called for delayed deliveries of Danner's potatoes to Simplot. Id. at 558. The bank claimed that the storage payments were included within proceeds of the potato crops, which Simplot protested. Id. at 557. On review, the court held that the storage payments were not included within proceeds, noting that the storage payment was received as an additional compensation for a service provided by Danner to Simplot rather than in consequence of the disposition of the crops., Id. at 558.
In contrast to Johanson, Simplot points out that here, as in Thompson, there is a separate contract section providing payment for hauling potatoes. However, the decision in Thompson stems from the court's view that the nature of storage payments is significantly different from a hauling allowance. The court noted that the term "proceeds" includes whatever is received upon disposition of collateral. It then reasoned that Danner received storage payments because the disposition of his crops was delayed and the storage payments were additional compensation for the storage service. The court concluded the storage payments fell outside the scope of the term "proceeds" even though the crops were subject to a security interest. Thompson, 507 N.W.2d at 558; see also In re Connelly, 41 B.R. 217, 220 (Bankr.D.Minn. 1984); In re Sumner, 69 B.R. 758, 762-63 (Bankr.D.Or.1986). In contrast, a hauling allowance, including the allowance in this case, is a payment received upon the sale of crops. Thus, a hauling allowance is an integral part of the disposition of the crops.[3]
Simplot also urges a more flexible approach to defining proceeds that looks to the language of the sales contracts between the parties. Simplot points out the hauling allowance is provided in a separate contract clause and this indicates that the parties did not intend the allowance to be a part of the sales price of the potatoes. However, if we conclude that the hauling allowance is not proceeds in this case because it is mentioned in a separate clause, brokers and carriers will be encouraged to create contract sections for freight allowances, commissions, or brokerage fees and the like, separate from the main sales section, lowering the value of the collateral. By doing so, the contracting parties can effectively undermine the interest of a secured party and could allow a creditor with subordinate rights to defeat a secured interest in collateral. This is exactly the court's concern in Cashmere Valley Bank. Simplot's position is contrary to our determination that the term "proceeds" includes all economic components that go into the total amount received for the product. Cashmere Valley Bank, 198 Wash. at 369-70, 88 P.2d 579; Cent. Wash. Bank, 113 Wash.2d at 361, 779 P.2d 697 (quoting Johanson, 164 Cal.App.3d at 592, 210 Cal.Rptr. 433).
Additionally, Simplot would not prevail under the approach it suggests. Here, the hauling allowance was an integral part of the potato-sales contract between Olsen and Simplot. According to the contract, Olsen was required to deliver his potatoes to a place designated by Simplot at Olsen's own expense. Although he was entitled to the hauling allowance along with the payment for potatoes, Olsen could collect these sums only after the potatoes were delivered. Plainly, these sums were "received upon the sale, exchange, collection or other disposition" of Olsen's potatoes and thus properly viewed as proceeds. Former RCW 62A.9-306(1).
We hold that the hauling allowance in this case constitutes proceeds of the potato crops and that Key Bank's security interest covers the check Simplot gave to Olsen for that purpose.
*1057 Simplot next argues that there can be no conversion where there is a benefit to the owner. Simplot claims that Key Bank incurred no damages or at most only mitigated damages even if Key Bank's security interest covers the check for hauling. Essentially, Simplot argues that the hauling allowance would have been used to pay Olsen's farming expenses in 1998 regardless of whether Key Bank or Olsen received the check from Simplot. In support of the argument, Simplot relies on three out-of-state cases in which the courts stated that the damages are mitigated if the victim receives benefits from the conversion. United States v. Keeling, 131 F.Supp. 304, 307 (W.D.Ark.1955); Burke County v. First Nat'l Bank, 73 F.2d 783, 785 (5th Cir.1934); Ballenger v. Liberty Nat'l Life Ins. Co., 266 Ala. 407, 412, 96 So.2d 728 (1957).
No Washington case has adopted the approach urged by Simplot, and Simplot points to no evidence sufficient to create an issue of material fact on whether Key Bank benefited from the proceeds of the check.

CONCLUSION
We hold that the hauling allowance paid as a part of the sale of crops is proceeds as defined in former RCW 62A.9-306(1). Accordingly, we conclude that the trial court did not err in granting a motion for summary judgment in Key Bank's favor. We reverse the judgment of the Court of Appeals and reinstate the trial court's summary judgment.
ALEXANDER, C.J., JOHNSON, BRIDGE,OWENS and FAIRHURST, JJ., concur.
SANDERS, J., (dissenting).
J.R. Simplot Co. contracted with farmer Lynn Olsen to buy potatoes. The price was computed per ton and varied depending on the quality of potatoes Olsen delivered. See Clerk's Papers (CP) at 1959-60, § III (J.R. Simplot Co. Potato Growing Agreement, dated June 16, 1997).[1] The terms of the contract required Olsen to bear the cost of delivering the potatoes to a site chosen by Simplot if within eight miles. CP at 1962, § VI.2 ("Said potato crop shall be harvested and delivered field run to the Company at the expense of the Grower." (emphasis added)). Only when Simplot instructed Olsen to deliver the potatoes outside an eight mile radius did the provision central to this case become relevant:
The Company [Simplot] shall pay to the Grower [Olsen] a haul allowance of Sixteen Cents ($.16) per ton mile for all usable potatoes to which the Eighty Dollars ($80.00) base price applies for each mile one way, over eight (8) miles and limited to forty (40) miles (maximum payable mileage thirty-two (32) miles) from the public road nearest the Grower's field as described in Section II above to the point of delivery designated by the Company. Payments will be made at the same time as the first payment to Grower as set forth in Section VII below.
Id. at 1962, § VI.4. Stated another way, while the cost of shipping the crops up to eight miles was included in the price of crops, Simplot agreed to compensate Olsen in addition to the agreed price for an added service Olsen would provide. Such compensation would increase or decrease depending not on the value of the potatoes delivered but rather on the distance traveled. But despite the parties' express contract that this hauling allowance was solely payment for a service separate from the price of the goods, the majority broadly holds the payment constitutes "proceeds," defined by former Article 9 of the Uniform Commercial Code (U.C.C.) as adopted in Washington as "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." Former RCW 62A.9-306(1) (LAWS OF 1995, ch. 48, § 68). However since this payment was given in consideration of a service, not the collateral, I would hold the *1058 hauling allowance was not "proceeds" for the sale of the collateral and affirm the Court of Appeals.

I. Contract for Services, Not Crops
Thompson v. Danner, 507 N.W.2d 550 (N.D.1993) is instructive, though the majority attempts to distinguish it. Similar to these facts the creditor bank there held a perfected security interest in the debtor's potato crops and proceeds thereof. Id. at 553. The debtors received storage payments from Simplot (who was the buyer in that case as well) because the sales contracts called for delayed deliveries of the potatoes. Id. at 558. Simplot would pay the debtors an amount which varied depending on how much time the potatoes were left in storage. Id. The court pointed to two separate bankruptcy cases, In re Sumner, 69 B.R. 758 (Bankr.D.Or.1986), and In re Connelly, 41 B.R. 217 (Bankr. D.Minn.1984), both of which held payments received in conjunction with government grain set-aside programs did not constitute proceeds. Sumner, 69 B.R. at 763; Connelly, 41 B.R. at 220. Thompson followed suit to hold the storage payments were not proceeds but rather compensation for an additional service, stating:
Contrary to the Bank's assertion that these payments are merely "a premium added to the agreed upon price," the amount of the storage payment is directly related to the length of time the potatoes are held in storage. The payment is not received in consequence of the disposition of the crop, but is additional compensation for a service provided by the Danners to Simplot.

Thompson, 507 N.W.2d at 558 (emphasis added). The same is true here. Olsen was to bear the cost of transporting the potatoes to a site designated by Simplot within eight miles. CP at 1962, § VI.2. However if Simplot instructed the grower to ship the potatoes to a site farther than, eight miles away from Olsen's farm, it compensated Olsen a separate sum for the added cost of transportation, not an additional sum for the potatoes themselves. CP at 1962, § VI.4. Thus, like in Thompson, this hauling allowance "is not received in consequence of the disposition of the crop, but is additional compensation for a service provided by [Olsen] to Simplot." Thompson, 507 N.W.2d at 558. The amount which Simplot paid Olsen for hauling the potatoes had nothing to do with the value of the collateral transferred but rather varied by the distance traveled from origin to destination. Accord id. There is no meaningful distinction between Thompson and this case.

II. Proceeds Must Be Received for the Collateral, Not Services
The majority disregards the contractual language, holding "a hauling allowance is an integral part of the disposition of the crops." Majority at 1056. However I know of no legal principle which states any farmer must, ipso facto, bear the cost of hauling his crops to a remote location without additional compensation for transportation. If that were the rule farmers would sell only to local customers, losing the potential benefits of a national market. For the same reason the secured party would also lose the potential to maximize the price of the collateral.
But rather than hinge my analysis on arbitrary notions of what a black robed judge might opine is an "integral" part of a sales contract, majority at 1056, I direct my attention exactly where a court should: the statutory language and the text of the contract. State v. J.P., 149 Wash.2d 444, 450, 69 P.3d 318 (2003); Rainier Nat'l Bank v. Bachmann, 111 Wash.2d 298, 302, 757 P.2d 979 (1988). The statutory language here at issue provides "proceeds" "are whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." Former RCW 62A.9-306(1).
If the statute said nothing more than "whatever is received," the majority would have a point. But the remainder of the definition requires the whatever to be "received upon the sale, exchange, collection or other disposition of collateral." Former RCW 62A.9-306(1) (emphasis added). In other words, "whatever" received is the value received from the sale of the collateral, not from the sale of something else. My reasons follow.
The revised code does not explicitly define "upon," thus compelling analysis of the dictionary definition. Am. Legion Post No. 32 *1059 v. City of Walla Walla, 116 Wash.2d 1, 8, 802 P.2d 784 (1991); Rainier Nat'l Bank, 111 Wash.2d at 303, 757 P.2d 979. Webster's defines "upon" two separate ways which could be applied to former RCW 62A.9-306(1).[2] The first option defines "upon" as "immediately following on [ ] very soon after." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2518 (1993) (using as example sentence "[upon] his death, she went on the... stage"). But certainly here "upon" cannot mean something temporal. For example, were we to follow this definition, we would be forced to include in "proceeds" any lottery winnings received by the debtor contemporaneously with income from the sale of collateral. This is absurd. J.P., 149 Wash.2d at 450, 69 P.3d 318 (courts must avoid absurd results when interpreting statutes).
This leaves the alternative definition of "upon," which means "in answer to [ ] in satisfaction of." WEBSTER'S, supra, at 2518 (using as example sentence "transcripts are sent [upon] the request of the particular student"). This definition is consistent with the purpose behind extending security interests to the proceeds of collateral, namely to protect the creditor's ability to secure repayment of the debt owed notwithstanding the debtor's transfer of the collateral to a third party. Cf. In re H.S.A. II, Inc., 271 B.R. 534, 541 (Bankr.E.D.Mich.2002) (recognizing secured party is still protected notwithstanding the transfer of collateral to buyer in ordinary course of business as security interest remains in proceeds of collateral). Property in the debtor's possession still secures the debt owed to the creditor, even though the original collateral is now in someone else's possession.[3] This makes sense, for if "proceeds" were merely whatever the debtor receives during the time his or her property is subject to a security interest, the collateral's value would grow exponentially beyond that contemplated by the debtor and secured creditor identified in the security agreement.
Consequently, a payment must be received "in answer to" or "in satisfaction of," WEBSTER'S, supra, at 2518, the "sale, exchange, collection or other disposition of collateral" to constitute proceeds. Former RCW 62A.9-306(1). The payment must therefore be the bargained-for consideration received by the debtor in direct exchange for the transfer of collateral.
But this hauling allowance was paid in addition to the price of the collateral. It was not merely a reimbursement of included shipping costs, which under the terms of the sales agreement Olsen was to bear, but rather extraordinary shipping costs for which additional compensation would be due. Simplot compensated for a service Olsen provided that was separate and distinct from the sale of the crops. The allowance was not i"n answer to" or "in satisfaction of" the sale of the potato crops, WEBSTER'S, supra, at 2518, but rather for a trucking expense unrelated to the value of the potatoes.

III. "Whatever" Must Be Limited to its Facts
The majority claims Rainier National Bank, 111 Wash.2d 298, 757 P.2d 979, supports its definitional construction, centering its analysis on the court's statement, "[T]he expansive statutory definition of `proceeds' [should] be given `a flexible and broad content.' " Id. at 302, 757 P.2d 979 (quoting In re Munger, 495 F.2d 511, 513 (9th Cir. 1974) ).[4] But the majority fails to mention Rainier National Bank emphasized its *1060 "analysis [was] made in the factual context presented." Id. (emphasis added) (citing In re Cupp, 38 B.R. 953 (Bankr.N.D.Ohio 1984)) (emphasis added). Closer scrutiny of that factual context reveals the majority's reliance is misplaced.
The creditor bank there held a perfected security interest in the debtor's livestock and all proceeds thereof. Id. at 299, 757 P.2d 979. The debtor took advantage of a federal program instituted to maintain milk prices, which required the sale of all livestock for auction or slaughter and an agreement to leave the milk production industry for a period not less than five years. Id. at 299-300, 757 P.2d 979. The debtor elected to sell his cattle for slaughter, and in consideration he received over $670,000 from the federal government. Id. at 300, 757 P.2d 979. The court quoted the dictionary definition of "whatever," noting its broad scope includes "`anything ... everything ... no matter what ... anything at all.'" Id. at 303, 757 P.2d 979 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2600 (1976)). Reasoning the sale of the livestock for slaughter under the federal program was within the statutory phrase "or other disposition" and noting the payments were received for such disposition, the court held the government payments constituted proceeds of the livestock. Id. at 303, 308, 757 P.2d 979.
But the issue here is not as it was in Rainier National Bank, namely whether the transfer of collateral between Simplot and Olsen was a sale or other disposition covered by former RCW 62A.9-306(1); certainly it was. Rather our issue is whether Simplot's payment to Olsen for a trucking service additional to the transfer was "received upon" that transaction. Former RCW 62A.9-306(1). The "whatever" component, despite its expansive nature, references the immateriality of the types of consideration given in exchange for collateral, which is evidenced by former RCW 62A.9-306(1)'s explicit recognition that both cash and noncash consideration constitute proceeds. Accord Rainier Nat'l Bank, 111 Wash.2d at 303, 757 P.2d 979 (noting "statute evidences an intent to include more than the usual cash proceeds received in a normal sale of the collateral"). But it does not and cannot eliminate the requirement that the consideration be given in response to the debtor's transfer of collateral. Therefore payment, "whatever" its nature, former RCW 62A.9-306(1), must still be received by the debtor "in answer to" or "in satisfaction of" the transfer of the collateral to a third party, WEBSTER'S, supra, at 2518, to qualify as proceeds under the U.C.C. Rainier National Bank does not negate this principle.[5]
I further take issue with the majority's willingness to disregard the language of the actual sales contract because of its fear debtors and third-party buyers might engage in creative contracting to defeat a creditor's security interest. See majority at 1056. Such a fear is unfounded, especially since both the common law and equity supplement the U.C.C. and each gives the creditor a remedy should a debtor and third party act tortiously to defeat the creditor's property right. See RCW 62A.1-103;[6]see also RCW 62A.9A-102(c) (noting general principles and rules of interpretation contained in Article 1 of Title 62A RCW apply to Article 9A). Moreover, such a view disregards Rainier National Bank's instruction to consider these cases in "the factual context presented." Rainier Nat'l Bank, 111 Wash.2d at 302, 757 P.2d 979. Here "the factual context presented" by this contract encourages Olsen to sell to Simplot for an $80 base price[7] by not risking uncompensated remote delivery. If anything, removal of this contingency benefits the creditor by encouraging the sale without giving Simplot any incentive to require delivery any further than necessary because Simplot has to pay for the delivery in addition to the potatoes.
My view is further supported by the far more expansive definition of "proceeds" in *1061 the revised secured transactions article adopted by the legislature in 2000. See LAWS OF 2000, ch. 250, § 9A-102(64), codified at RCW 62A.9A-102(64). In addition to the language of former RCW 62A.9-306(1), see RCW 62A.9A-102(64)(A) (same language as first sentence of former RCW 62A.9-306(1)), now proceeds may also be "[w]hatever is collected on, or distributed on account of, collateral," RCW 62A.9A-102(64)(B), as well as "[r]ights arising out of collateral," RCW 62A.9A-102(64)(C). If former RCW 62A.9-306(1) is as broad as the majority claims, then the legislature needlessly expanded the definition. This cannot be the case as "`[t]he legislature does not engage in unnecessary or meaningless acts, and we presume some significant purpose or objective in every legislative enactment.'" Simpson Inv. Co. v. Dep't of Revenue, 141 Wash.2d 139, 159, 3 P.3d 741 (2000) (quoting John H. Sellen Constr. Co. v. Dep't of Revenue, 87 Wash.2d 878, 883, 558 P.2d 1342 (1976)).
The cases relied on by the majority are not to the contrary. In Central Washington Bank v. Mendelson-Zeller, Inc., 113 Wash.2d 346, 348-49, 779 P.2d 697 (1989), the creditor bank owned a perfected security interest in the debtor's apple orchard crops and its proceeds. The creditor bank filed a conversion action against a third party who had performed marketing services on behalf of the debtor and retained a percentage of the gross proceeds from the sale of the apple crop. Id. at 350, 779 P.2d 697. At issue was whether the "[b]ank's security interest extend[ed] to the gross proceeds or only the net proceeds after costs of processing and sale." Id. at 351, 779 P.2d 697. Relying on both Johanson Transportation Service v. Rich Pik'd Rite, Inc., 164 Cal.App.3d 583, 210 Cal.Rptr. 433 (1985), and In re Estate of Philp, 114 Ill.App.3d 107, 448 N.E.2d 535, 69 Ill.Dec. 817 (1983), we held the U.C.C. definition of proceeds included gross proceeds and not just the net benefit earned as a result of the sale. Cent. Wash. Bank, 113 Wash.2d at 361, 779 P.2d 697.
Likewise in Johanson Transportation the debtor business had sold its strawberry crops which were subject to a security interest on a "sold delivered" or "delivered price" basis, meaning "the freight charges were included in the total cost to the fruit buyer and not charged separately." Johanson Transp., 210 Cal.Rptr. at 435 (emphasis added). When payment for the strawberries arrived, the debtor deposited the sales revenue in an account controlled by the creditor bank. Id. at 434-35. The debtor failed to repay the transportation broker for funds it advanced to the truckers for shipping the strawberries, inducing the broker to sue the creditors for conversion. Id. at 435. Holding the gross proceeds received by the debtor for the sales were "proceeds" of the strawberries, the California Court of Appeal concluded:
To us it seems illogical to agree that the cost of the seed, fertilizer, other agri-chemicals, water, picking, packaging, etc., are included within the term "proceeds" but the cost of transporting the product to market is not. Such an argument exalts form over substance and should be rejected. "Proceeds" includes all economic components that go into the total amount received for the product.

Id. at 438 (emphasis added). The most one can say about both Central Washington Bank and Johanson Transportation is that a security interest will attach to gross proceeds, not just the net benefit the debtor derives from the sale of collateral, because there the product was sold at its point of destination. It would have been a different case had the buyer arranged to purchase the strawberries in California and then entered into a separate arrangement to truck them to the east coast. The former is an expense absorbed by the farmer, i.e., part of the gross; however the latter is not part of the gross but compensation for an additional service. In sum, neither case displaces the unambiguous statutory requisite that consideration received by the debtor must be in direct exchange for the sale or other disposition of collateral.
Had Simplot designated a delivery location within an eight mile radius of Olsen's farm, Olsen would not have been entitled to any additional compensation. The entire sum received by Olsen would have been for the potatoes and the transportation costs subsumed in the gross price, rendering such sum proceeds. But, unlike the situation in Johanson Transportation where there was no additional service provided by the debtor in addition to the sale of the strawberries, Olsen *1062 provided Simplot with a supplemental service of delivering the potatoes outside the normal eight mile radius contemplated by the contract. The hauling allowance was not "in answer to" or "in satisfaction of" the sale of potatoes to Simplot. WEBSTER'S, supra, at 2518. It therefore was not "received [by Olsen] upon the sale" of the potato crop and consequently not proceeds. Former RCW 62A.9-306(1).

CONCLUSION
Simplot paid Olsen $160,607.44 to transport potato crops, not for the crops themselves. It therefore does not constitute "proceeds" from the sale of the crops and is not subject to the bank's security interest. To hold otherwise discourages commerce and ultimately works to the disadvantage of all concerned. I would therefore follow the sound reasoning of Thompson and affirm the Court of Appeals.
CHAMBERS and IRELAND, J., concur.
NOTES
[1] "`A conversion is a willful interference with a chattel without lawful justification, whereby a person entitled thereto is deprived of the possession of it.'" Paris Am. Corp. v. McCausland, 52 Wash.App. 434, 443, 759 P.2d 1210 (1988) (quoting Olin v. Goehler, 39 Wash.App. 688, 693, 694 P.2d 1129, review denied, 103 Wash.2d 1036 (1985)). When a debtor transfers collateral subject to a perfected security interest, the secured party may commence an action against the purchaser for conversion. See, e.g., Washington State Bank v. Medalia Healthcare, L.L.C., 96 Wash.App. 547, 550-52, 984 P.2d 1041 (1999).
[2] Premium did not appeal the order of summary judgment in favor of the bank. Cent. Wash. Bank v. Mendelson-Zeller, Inc., 113 Wash.2d 346, 350, 779 P.2d 697 (1989).
[3] Although Thompson can be factually distinguished, we also find the rationale of Thompson questionable. The court relied on two cases that held that storage payments received in connection with participation in a government grain set-aside program are not "proceeds" of the grain placed in storage. Id. at 558. This view appears inconsistent with our holding in Rainier National Bank v. Bachmann, 111 Wash.2d 298, 757 P.2d 979 (1988).
[1] Each of the potato growing contracts relevant to this case appears on standardized forms and deviates only with respect to the price per ton and quantity sought. See, e.g., Pl.'s Ex. 89, 101. In the interest of simplicity I will cite only to the June 16, 1997 agreement between Olsen and Simplot, on which Key Bank relied in its motion for summary judgment of dismissal. See Clerk's Papers (CP) at 1959-64.
[2] Other definitions include "in a high position on" or "in or into close proximity or contact with by way of or as if by way of attack." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY. 2517 (1993). These are plainly inapposite.
[3] Of course the security interest remains attached to the original collateral and its proceeds if the debtor fails to obtain the creditor's authorization to transfer the collateral free of the security interest, thereby protecting the creditor even further. Former RCW 62A.9-306(2); RCW 62A.9A-315(a)-(1)(2).
[4] I pause to note the court which coined the phrase "flexible and broad content" on which the majority so heavily relies, In re Munger, 495 F.2d 511 (9th Cir.1974), quoted in Rainier Nat'l Bank, 111 Wash.2d at 302, 757 P.2d 979, did so while construing a temporal definition of proceeds which was never adopted in Washington. See id. at 513 (quoting former CAL. COM.CODE § 9306(1) (1974)) (defining proceeds as "`whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of.'" (emphasis added)).
[5] As such I am even less persuaded by the majority's rejection of Thompson as contrary to Rainier National Bank, 111 Wash.2d 298, 757 P.2d 979. See majority at 1056 n. 3.
[6] That section provides in relevant part, "Unless displaced by the particular provisions of this Title, the principles of law and equity, including... fraud, misrepresentation, ... or other validating or invalidating cause shall supplement its provisions." RCW 62A.1-103.
[7] At least one other contract between Olsen and Simplot utilized a $71 base price. See Def.'s Ex. 101, § III.1.